BROWN-KING CONST. CO. v. BOWER.

(Circuit Court of Appeals, Third Circuit.   July 29, 1918.)

No. 2376.

PARTNERSHIP ☞53—THE RELATION—EVIDENCE.

Evidence in suit based on existence of partnership between the parties for doing railroad excavation, contract for doing which was obtained by defendant, *held* not to establish the relation, but only on executory agreement for entering into a partnership agreement, the terms of which were in part undefined.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Suit in equity by the Brown-King Construction Company against Charles P. Bower. Bill dismissed, and plaintiff appeals. Affirmed.

Isaac A. Pennypacker and George Wharton Pepper, both of Philadelphia, Pa., for appellant.

Murdoch Kendrick, of Philadelphia, Pa., for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

PER CURIAM. The evidence in this case was heard by Judge Thompson, and the facts are fully set out in his clear and satisfactory opinion, which is as follows:

"The Brown-King Construction Company, the plaintiff, filed its bill in equity against Charles P. Bower and Edward C. Nolan, praying for the dissolution of a partnership alleged to have been formed between the plaintiff and Bower for the purpose of contracting with the Philadelphia & Reading Railway Company for the performance of certain grading and construction work in the railway company's yards at South Bethlehem, Pa., and also praying for the appointment of a receiver to carry out the terms of the contract with the railway company, for an accounting, and for an injunction restraining the defendants from disposing of the property of the alleged copartnership, and from collecting or receiving any money from the railway company in connection with the work, and from interfering with its prosecution. It is charged in the bill that Bower, having entered into the contract with the railway company, was persuaded and induced by Nolan, his brother-in-law, to repudiate the partnership agreement, in order that Nolan might receive an interest in the contract in consideration of financial assistance to Bower, and, upon information and belief, that Bower has admitted Nolan to a share in the contract without the plaintiff's consent and in disregard of its right and interest, and that the work is being carried on by the two defendants. The plaintiff and both of the defendants are engaged in the business of general constructing contractors for railroad work. Testimony was offered on behalf of the plaintiff. The defendants offered no evidence. There being no evidence to sustain the allegations of the bill as against Nolan, the bill was dismissed as to him.

"From the testimony it appears that the plaintiff, during June, 1917, had, available for work, equipment consisting of two locomotives, fourteen standard gauge air dump cars, and a spreader car, and, having learned from Bower that the Philadelphia & Reading Railway Company had invited him to bid upon certain grading and construction work at South Bethlehem, through Fred L. Brown, its engineer, agreed with Bower on June 20th that he and Brown would inspect the site of the work the next day for the purpose of having Bower

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

make a bid upon it. The following day, June 21st, Brown and Bower went to South Bethlehem, looked over the proposed work, and discussed its features and methods by which Bower should bid upon it. The grading work involved 268,000 cubic yards. The railway company's proposal called for the use of its own cars and motive power in moving the material from the cut to the embankment, and it was proposed, if the contract was obtained, to use the plaintiff's equipment in order to save cost in moving material. On the evening of June 21st, at the office of plaintiff, Messrs. Brown and Bower, after figuring together, estimated the probable cost of the excavation, and in consequence it was then arranged that Bower should submit a bid as follows: For excavation without classification, using the cars and locomotives of the railway company, 57 cents per cubic yard, and for excavation without classification of 65,000 cubic yards, requiring an alternative bid using the contractor's cars and motive power, $1.60 per yard. A bid upon the specifications was thereupon signed by Bower and sent to the railway company. It was agreed between the parties to use the language of the witness, 'We will handle this work on a fifty-fifty basis,' or 'We will go into this contract on a fifty-fifty basis.' The agreement between the parties at the time was that Bower, who had been invited to bid, was to endeavor to obtain the contract, and, if successful, the plaintiff's equipment above referred to was to be used upon the work, and that the transaction should be upon a fifty-fifty basis; in other words, that the plaintiff and defendants were to share the profits equally. During the discussion the profits were estimated at $25,000 to each of the parties. The result of Bower's bid was that, during the latter part of June he was notified by the railway company that the contract had been awarded to him.

"After visits to the site by the plaintiff's engineers in company with other contractors, it was agreed between the parties that the contract for the portion of the work involving the 65,000 yards to be removed without the use of the railway company's equipment be sublet to H. C. Ambler at the price of 60 cents per cubic yard. Meanwhile, before any contract had been entered into with the railway company, the plaintiff shipped the two locomotives, fourteen dump cars, and one spreader car from Northumberland, where they had been employed, to South Bethlehem, consigned to itself. There had been discussion between the parties relating to the possibility of obtaining a higher price than 57 cents per cubic yard for the excavation work for which that price had been bid, provided that the railway company's equipment was released and the plaintiff's equipment was substituted for it, but at the time the equipment was sent to South Bethlehem there had been no agreement by Bower with the railway company for its use. Bower had taken up this question with Mr. Dawson, the railway company's engineer, informing the plaintiff's officers from time to time of the progress of his negotiations, and having finally obtained the consent of the railway company's engineers, on July 19th, wrote a letter to the chief engineer of the railway company, offering to furnish all necessary cars and locomotives, with fuel and maintenance, and to transport all excavation at the uniform price of 77 cents per cubic yard, eliminating the bid of $1.60 upon the 65,000 yards. On July 21st, the chief engineer of the railway company in a letter to Bower accepted the modified proposal and notified him that contracts would be drawn accordingly for his execution. During all these negotiations between the plaintiff's engineers and Bower, up to July 30th, no features of the agreement for sharing profits between them had been discussed except those agreed to on June 21st.

"It is stated in the bill and admitted in the answer that the agreement between the parties was to be reduced to writing. About July 28th, Bower sent the plaintiff a written draft embodying his ideas of the terms of an agreement. This form of agreement designating the plaintiff as the 'owner' and Bower as the 'contractor,' recited that the contractor had entered into a contract for the grading and excavation at South Bethlehem and that he would need certain equipment possessed by the owner and also might need working capital; that the owner was willing to provide the equipment and one-half of the necessary working capital and set out the following terms: (1) The owner to furnish the equipment. (2) The owner, if any additional sum for pay rolls or expenses became necessary, to contribute to the working capital one-half of

such sums within 48 hours after request in writing. (3) The contractor to pay the owner one-half the net proceeds upon completion of the work and receipt of all payments due. (4) The net proceeds be ascertained after payment of expenses and deduction of a drawing account of $250 a month for the services of the contractor as supervisor, the owner to be responsible for one-half of any loss on the contract. (5) The contractor to give his personal attention to the supervision and management, to be sole judge of all expenses, and to have sole and absolute authority to perform the work under the contract. (6) The contractor to keep the books of account and furnish a final statement upon completion of the work.

"On July 30th a conference was had at the plaintiff's office, at which Brown, King, and Gimber, representatives of the plaintiff and Bower, were present. Brown and Gimber made various objections to Bower's proposed agreement. They objected to the plaintiff being designated 'owner' and Bower 'contractor,' and contended that the terms of the agreement proposed by Bower implied the rental of their equipment and failed to carry out the terms of the fifty-fifty agreement. They suggested financing the work through a joint note for $5,000 of the Brown-King Company and Bower, to be negotiated with the Franklin Trust Company and to be secured by an assignment from Bower of his contract with the railway company as security. Both Gimber and Brown testified that Bower agreed to assign the contract as security for the joint note. Bower's sworn answer denies that he agreed to the assignment. Upon this important point the testimony of Brown and Gimber is not sufficiently definite in statement of what was said to support their conclusion. Both Brown and Gimber testified that Bower agreed that the proposed method of raising money was a very good idea and said: 'Write that down. That is a good idea.' This testimony must be taken in connection with the fact that what was agreed to was that Brown and Gimber, being dissatisfied with Bower's proposed agreement, should submit the terms suggested by the plaintiff and that Bower wanted it put into writing for further consideration. The contract with the railway company by its very terms renders all payments thereunder nonassignable. The engineer of the Philadelphia & Reading Railway Company had sent the contract in duplicate to Mr. Bower for his signature on July 26th, so that he was familiar with its terms during the discussion of his proposed agreement on July 30th, and during the discussion of the plaintiff's proposed agreement on August 1st. The contract, according to the chief engineer's letter, was not to be dated until executed by the officers of the railway company and was dated August 3d. It is difficult to believe that Bower would have agreed to an arrangement which he could not carry out and which, if it could have been carried out, would relieve the plaintiff of any burden in financing the operation and put the entire risk upon the contract for the performance of which Bower was individually responsible to the railway company. Regarding the conclusions to be drawn from the evidence of what was said in the light of the circumstances rather than the conclusions of the witnesses, I am unable to find from the evidence that that suggestion of the plaintiff was ever agreed to by Bower. Brown and Gimber further objected to the provisions that Bower was to be the sole and supreme judge of all expenses and was to have sole and absolute authority to perform the work under contract.

"Bower and Gimber suggested as a substitute terms which were afterwards embodied in a draft of agreement prepared by Gimber. While their agreement set out that Bower should, during the progress of the work, consult with the engineers of the Brown-King Construction Company, it provided that if he failed to secure their full concurrence, he would have final authority to determine plans upon which the work should be executed. It further provided that he should consult with the plaintiff's engineers in the matter of expenses to be incurred, but should have final authority to determine such expenses himself. There could be no serious question that these suggested modifications, if agreed to, would have left Bower in full control of supervising the work, as well as of incurring expenses, and therefore did not differ materially from the terms proposed by him. Both parties agreed to an allowance of $250 a month for Bower's services. Brown and Gimber objected to the proposed post-

ponement of the division of the profits until the final completion of the work and final payments. There is no evidence to show that Bower specifically agreed to any other terms for the division of profits, except that in its connection with the suggested arrangement for a loan to be carried by means of the funds derived from the monthly estimates and payments by the railway company, he agreed that it was a good idea and asked those present to write it down, and Brown testified that Bower agreed with him that it was a very good way of carrying on the work.

"It is apparent from the testimony that, on July 30th, while there was a general discussion between the parties and an exchange of ideas, there was no definite agreement on Bower's part to the plaintiff's terms. As a result of the conference, it was merely agreed that a written agreement should be drawn up for the plaintiff, which was to be the subject of further discussion upon a later day. On August 1st the defendant again called at the plaintiff's office and was shown the form of agreement set out in the plaintiff's bill as drawn by Mr. Gimber. Mr. Nolan was present with him, and Mr. Nolan suggested that a rental form of contract be drawn. This was discussed between Mr. Nolan and Mr. Gimber, and when Bower and Nolan left the office, after Gimber had requested Nolan to make a suggestion, it was with the statement on Nolan's part, 'We will take this into consideration and you think up a rate of rental for your equipment.' On August 16th Bower informed the railway company that he had sublet to H. C. Ambler the subcontract for the 65,000 cubic yards part of the work. After the interview of August 1st, there was some correspondence between the plaintiff and Bower, which, however, was not offered in evidence. Bower entered upon and at the time of the hearing was engaged in the performance of his contract with the railway company. The remedies which the plaintiff ask are based upon a claim of an existing partnership between itself and Bower. The entire situation may be summed up as follows:

"The plaintiff and Bower agreed on June 21st that Bower would endeavor to obtain the contract with the Philadelphia & Reading Railway Company; that, contingent upon the contract being obtained, the plaintiff's equipment would be used upon the work; that the transaction would be upon a fifty-fifty basis. The understanding of both parties in relation to the fifty-fifty basis, as shown by both the subsequent proposed written agreements, was that they should contribute equally to the working capital, and share equally in the profits and the losses. It was agreed that an agreement in writing should be entered into between them. As the relations between them were contingent upon Bower obtaining the contract, it followed that the time for entering into a written agreement was to be postponed until that event was determined. The written agreements proposed by both parties included all of the terms that had been previously mutually agreed upon, but each included other terms. The plaintiff, however, declined to accept the terms proposed by the defendant, the plaintiff's officers basing their objection to the defendants' terms partly upon their contention that it constituted an agreement for a lease of their plant rather than a fifty-fifty agreement, which term, in their minds, constituted an agreement of partnership. While a rental of the plaintiff's equipment by Bower for a share of the profits would not in itself as between the parties constitute a partnership, the addition to that of an agreement to contribute half the working capital and be liable for one-half the losses would very strongly indicate a partnership relation. This form of agreement was, however, repudiated by the plaintiff, because it desired to incorporate therein an agreement that the funds necessary for carrying on the work should be raised by a joint note and that Bower's contract be pledged as security for the note, and as a substitute for Bower's proposed division of profits after completion of the work an agreement for monthly division of profits, and for inclusion within the terms of the contract of any additional work appurtenant to the work to be done under the contract.

"The plaintiff having declined the terms set forth in Bower's agreement, the conference between the parties on July 30th resulted in nothing more than a discussion of the new terms proposed by the plaintiff, and it was agreed that the plaintiff's suggested terms should be incorporated in a written form of agreement and submitted to Bower, so that when the parties parted on that

day there had been no definite agreement as to terms, but the matter was left open for further consideration. When they met again on August 1st, no agreement was reached and there has never been a final meeting of the minds of the parties. That being the situation, the court cannot hold as a matter of law that a partnership relation exists between the parties, but there was merely an executory agreement to enter into a contract in writing for the joint undertaking.

"It is contended by plaintiff's counsel that what was done by its officers and Bower in inspecting the work, in preparing the bids, in making agreements for letting the subcontracts, and Bower's acceptance of the acts of the plaintiff's officers in this respect are sufficient to show that a partnership was then in existence. It does not follow, because the plaintiff's officers assisted Bower, with a view of obtaining the contract with the railway company, and he consulted with them in relation to what would be done in case the contract was obtained, that their actions were anything more than preliminary to the entering into of contract, relations, provided the contract with the railway company was obtained. The final agreement was to be contingent upon Bower's obtaining the contract that was to be the source of profit to both parties, and hence it was to the interest of the plaintiff to consult and co-operate with the defendant.

"As the situation stands, the parties never agreed upon the terms of a contract for the joint undertaking, and that being the situation, the court cannot make a contract for them. What did exist between the parties was merely an executory agreement that at some future time, contingent upon Bower obtaining the contract with the railway company, an agreement, the terms of which were then in part undefined, would be entered into. The plaintiff has failed to establish the existence of a partnership relation between the parties, as alleged in the bill, and the bill must therefore be dismissed."

We agree with the findings and conclusions thus stated, and shall only add that we find it hard to suppose that experienced men of business would undertake an enterprise such as this, without first adjusting the many and obvious details that would be sure to produce immediate and disastrous disputes, if these were not carefully provided against. This was the object of the written agreement that the District Court finds both parties contemplated; the oral agreement was merely preliminary, and as they could not come to terms we see no basis for the interference of a court of equity.

The decree is affirmed.